<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 98-1986

                     ELWOOD STROUT, ET AL.,

                    Plaintiffs, Appellants,

                               v.

           J. DUKE ALBANESE, IN HIS OFFICIAL CAPACITY
               AS COMMISSIONER, MAINE DEPARTMENT
                  OF EDUCATION, ETC., ET AL.,

                     Defendants, Appellees.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF MAINE

          [Hon. D. Brock Hornby, U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

                Campbell, Senior Circuit Judge,

                   and Stahl, Circuit Judge.

                     _____________________

   Vincent P. McCarthy, with whom Ann-Louise Lohr, The American
Center for Law and Justice, Northeast, Brian W. Raum, American
Center for Law and Justice, New York, Stephen C. Whiting, The
Whiting Law Firm, P.A., Jay A. Sekulow and American Center for Law
and Justice, Inc. were on brief, for appellants.
   Peter J. Brann, State Solicitor, with whom Andrew Ketterer,
Attorney General, and Paul Stern, Deputy Attorney General, were on
brief, for appellee Commissioner, Maine Department of Education.
   A. Van C. Lanckton, Craig & MacCauley, PC and Marc D. Stern on
brief for American Jewish Congress, amicus curiae.
   Robert H. Chanin, John M. West, Alice O'Brien, Bredhoff &
Kaiser, P.L.L.C., Donald F. Fontaine, Fontaine & Beal, P.A.,
Steven K. Green, Ayesha N. Khan, Elliot M. Mincberg, Judith E.
Schaeffer, Barbara G. Shaw, Marcus , Grygiel & Clegg, PA,
Jeffrey A. Thaler, Bernstein, Shur, Sawyer & Nelson, Elizabeth J.
Coleman, Steven M. Freeman, Lauren A. Levin and David Rosenberg on
brief for Maine Education Association, National Education
Association, Americans United for Separation of Church and State,
People for the American Way Foundation, Maine Civil Liberties
Union, and Anti-Defamation League of B'nai B'rith, amici curiae.
    
                      ____________________

                          May 27, 1999
                      ____________________

        TORRUELLA, Chief Judge.  As we embark upon resolution of
the thorny questions presented by this appeal, it is appropriate
that we keep in mind that "[c]onstitutional adjudication does not
lend itself to the absolutes of the physical sciences or
mathematics."  Tilton v. Richardson, 403 U.S. 672, 678 (1971).  The
controversy before us patently reflects this truth.
        The issues raised require us to consider the sometime
competing values found in the Religion Clauses of the First
Amendment of the Constitution -- otherwise described as "the
internal tension in the First Amendment between the Establishment
Clause and the Free Exercise Clause."  Id. at 677.  "[B]oth are
cast in absolute terms, . . . either of which, if expanded to a
logical extreme, would tend to clash with the other."  Walz v. Tax
Commission, 397 U.S. 664, 668-69 (1970).
                           BACKGROUND
        Maine has enacted a statute providing schooling for those
students who live in communities that do not have public education
facilities because of insufficient student density.  For these
students, the state will pay grants directly to qualified private
educational institutions to subsidize their schooling, provided the
institutions are "non-sectarian" in nature.
        Plaintiff-Appellants are the parents of students who are
otherwise qualified to receive the benefits of this state-created
subsidy, except that they have chosen to send their children to
private sectarian schools.  After Maine refused to fund their
chosen sectarian institution, St. Dominic's Regional High School in
Lewiston, Maine, the parents brought an action in the United States
District Court for the District of Maine alleging numerous
violations of their rights under: (1) the Establishment Clause; (2)
the Equal Protection Clause; (3) the Free Exercise Clause; (4) the
Due Process Clause of the Fourteenth Amendment; and (5) the Speech
Clause of the First Amendment.
        The district court framed the issue before it as "whether
Maine is constitutionally required to extend subsidies to sectarian
schools."  It viewed plaintiff-appellants' arguments "in terms of
free exercise claims, establishment clause claims, equal protection  
claims and substantive due process claims," but found "it
unnecessary to address [them] separately or to analyze the various
tests that have been enumerated," because "[t]he same answer is
obvious for all."  Concluding that although plaintiff-appellants
were free to send their children to sectarian schools, "they do not
have a right to require taxpayers to subsidize that choice," the
district court rejected their claims and granted summary judgment
in favor of defendant-appellees.  This appeal followed.
        Below we address seriatim each of the bases on which the
plaintiffs' claim an entitlement to relief.
                           DISCUSSION
I.  Establishment Clause
        First, plaintiff-appellants argue that the statute,
2591(2), violates the Establishment Clause because, rather than
treating religion neutrally, it demonstrates a hostility toward
religion by excluding otherwise eligible sectarian schools from the
tuition program based solely on the religious viewpoint presented
by these schools.
        Although "this Nation's history has not been one of
entirely sanitized separation between Church and State," Committee
for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 760
(1993), and while various forms of aid to religious institutions
are permissible and have been approved by the somewhat inscrutable
guidelines of the Supreme Court, there is no binding authority for  

the proposition that the direct payment of tuition by the state to
a private sectarian school is constitutionally permissible.  See
id. at 780.
        A statement to the effect that "Congress shall make no
law respecting the establishment of religion," U.S. Const. amend.
I, is hardly equivocal language.  The fact that it is the first of
the several constitutional do's and don'ts contained in the Bill of
Rights may not have been coincidental.  Separation of church and
state constituted a paramount principle and goal in the minds of
some of the most influential of the Framers both by dint of
historical experience, and personal conviction.
        We highlight the proposition that in some cases in which
state infringement on the free exercise of religion takes place,
otherwise prohibited conduct may be permitted if the state
establishes an overriding societal interest. Upholding the
Establishment Clause, which is aimed at avoiding an entangled
church and state, is such a paramount interest.  In the long run,
an entanglement of the two has been shown by history to be
oppressive of religious freedom.  See Nyquist, 413 U.S. at 760;
Engel v. Vitale, 370 U.S. 421, 431 (1962) (such a union may tend
"to destroy government and to degrade religion."); Everson, 330
U.S. at 12 ("cruel persecutions were the inevitable result of
government established religions.").  The present case, in which
direct subsidies would be paid by the state to a sectarian primary
and secondary school, is such an imbroglio.
        In Nyquist, New York created a two-part program to help
defray the costs of educating low-income children who chose to
attend private religious schools.  See 413 U.S. at 762-67.  The
first part of the program provided for direct money grants from the
State to "qualifying" nonpublic schools to be used for the
"maintenance and repair of . . . school facilities and equipment to
ensure the health, welfare and safety of enrolled pupils."  Id. at
762.  The second part involved tuition reimbursement grants which
the state gave to low-income parents of private schoolchildren
(including those who attended religious schools) as partial
reimbursement for their children's tuition, and limited state
income tax relief for parents who did not qualify for the tuition
reimbursement.  See id. at 764.  The Court concluded that all three
programs were invalid under the Establishment Clause because they
had the primary effect of advancing religion.  See id. at 774-94.  
With reference to the reimbursement portion of the law, the Court
stated:
                     There can be no question that these grants
          could not, consistently with the
          Establishment Clause, be given directly to
          sectarian schools, since they would suffer
          from the same deficiency that renders
          invalid the grants for maintenance and
          repairs. In the absence of an effective
          means of guaranteeing that the state aid
          derived from public funds will be used
          exclusively for secular, neutral, and
          nonideological purposes, it is clear from
          our cases that direct aid in whatever form
          is invalid.
  
Id. at 780 (emphasis added).
        This dichotomy between direct and indirect aid is a
recurring theme throughout Establishment Clause litigation.  
Although not all cases fit neatly within this formula, and this
somewhat tenuous distinction has been the subject of considerable
criticism by academia, it is the closest thing that we have to a
workable bright line rule, or that perhaps is possible.
        Nevertheless, one thing is certain: the Supreme Court has
never permitted broad sponsorship of religious schools.  In those
instances in which the Court has permitted funding to flow to
religious schools, it has been in the context of a targeted grant,
available to a limited population, for a specific purpose.  See,  
e.g., Agostini v. Felton, 521 U.S. 203 (1997) (upholding a
federally funded program providing supplemental, remedial
instruction to disadvantaged children on a neutral basis, taught on
the premises of sectarian schools by government employees); Zobrest
v. Catalina Foothills Sch. Dist., 509 U.S. 1 (1993) (holding that
providing a deaf student with a government-paid sign language
interpreter who accompanies the student to classes in a sectarian  
school does not violate the Establishment Clause). "The problem,
like so many problems in constitutional law, is one of degree."  
Meek, 421 U.S. at 359 (citation and internal quotation marks
omitted).  We find no authority in the Court's jurisprudence for
now extending state support of sectarian schools from beyond the
class of particular, limited situations described above.  See supra
note 5.
        Moreover, reliance by plaintiff-appellants on the Supreme
Court's decision in Rosenberger v. Rector & Visitors of University
of Virginia, 515 U.S. 819 (1995), is misplaced. In Rosenberger, the
University of Virginia, a state instrumentality, authorized payment
to outside contractors for the printing costs of a variety of
publications issued by several student organizations.  These
payments, made from an activities fund generated by imposing
mandatory student fees, were  designed to support a broad range of
extracurricular student activities related to the University's
educational purpose.  The University withheld authorization for
payments to a printer with respect to one student organization's
publication because it deemed it to be contrary to University
guidelines prohibiting aid to religious organizations or
activities.  The student organization in question, as well as the
publications for which printing costs were sought, promoted a
"Christian" viewpoint.  The University's denial of printing
payments was successfully challenged by the student organization on
the basis of viewpoint discrimination.  See id. at 832-35; see also  
Regan v. Taxation with Representation, 461 U.S. 540 (1983) (holding
that the state cannot discriminate based on the viewpoint of
private persons whose speech it subsidizes).
        In answering the University's concerns that such payments
might run afoul of the First Amendment, the Court ruled that the
funding did not contravene the Establishment Clause because it was
"neutral towards religion."  Id. at 840.  The neutrality of the
program, the Court reasoned, distinguished it from a tax levied to
directly support a church.  See id.  There is a critical
difference "between government speech [or action] endorsing
religion, which the Establishment Clause forbids, and private
speech [or action] endorsing religion, which the Free Speech and
Free Exercise Clauses protect." Id. at 843 (emphasis in original,
internal quotation marks omitted).
        Most telling, from the perspective of the present case,
is the majority's analysis of the issues presented by that appeal:
                     The Court of Appeals (and the dissent) are
          correct to extract from our decisions the
          principle that we have recognized special
          Establishment Clause dangers where the
          government makes direct money payments to
          sectarian institutions.  The error is not
          in identifying the principle, but in
          believing that it controls this case . . .
          [T]he Court of Appeals decided a case that
          was, in essence, not before it, and the
          dissent would have us do the same. We do
          not confront a case where, even under a
          neutral program that includes nonsectarian
          recipients, the government is making
          direct money payments to an institution or
          group that is engaged in religious
          activity . . . . [T]he undisputed fact
          [is] that no public funds flow directly to
          [the student organization's] coffers."

Id. at 842 (emphasis added, internal citations omitted).
        In lauding neutrality as the keystone of Establishment
Clause jurisprudence, plaintiff-appellants forget that neutrality
is but one "hallmark of the Establishment Clause." Rosenberger, 514
U.S. at 846 (O'Connor, J., concurring). Rosenberger neither
trumpets the supremacy of the neutrality principle nor signals the
demise of the funding prohibition in Establishment Clause
jurisprudence.  See id. at 852 (O'Connor, J., concurring).
        The historic barrier that has existed between church and
state throughout the life of the Republic has up to the present
acted as an insurmountable impediment to the direct payments or
subsidies by the state to sectarian institutions, particularly in
the context of primary and secondary schools.  See Tilton v.
Richardson, 403 U.S. at 684-87 (relying on the lessened danger of
prohibited entanglement when college level institutions are
involved); Hart v. McNair, 413 U.S. 734 (1973) (upholding the
creation of a public agency designed to assist in the placement of
revenue bonds for the construction of buildings designed for
secular use at higher education facilities including parochial
colleges).  Although the guidance provided by the Supreme Court has
been less than crystalline, perhaps often by necessity due to the
subject matter involved, approving direct payments of tuition by
the state to sectarian schools represents a quantum leap that we
are unwilling to take.  Creating such a breach in the wall
separating the State from secular establishments is a task best
left for the Supreme Court to undertake.
        Finally, we are at a loss to understand why plaintiff-
appellants believe that the Establishment Clause gives them a basis
for recovery.  The Establishment Clause forbids the making of a law
respecting the establishment of any religion.  There is no relevant
precedent for using its negative prohibition  as a basis for
extending the right of a religiously affiliated group to secure
state subsidies.
II.  Equal Protection
        Plaintiff-appellants argue that in addition to violating
the Establishment Clause, Maine's alleged hostility towards
religion violates their rights under the Equal Protection Clause of
the Fourteenth Amendment.  They claim that by virtue of the statute
in question they are being discriminated against on the basis of
religion, religious beliefs, speech content, and association.
        Plaintiff-appellants' equal protection claims fail for
many of the same reasons that their Establishment Clause challenge
founders.  Writ simple, the state cannot be in the business of
directly supporting religious schools.  Plaintiff-appellants' equal
protection claims fail, because, regardless of the appropriate
level of scrutiny we employ, the state's compelling interest in
avoiding an Establishment Clause violation requires that the
statute exclude sectarian schools from the tuition program.
        Plaintiff-appellants allege on appeal that they "have
been singled out simply because they desire their children to be
educated in a Christian environment and from a biblical
perspective, and for no other reason."  Appellants' Br. at 23-24.  
Plaintiff-appellants desire that the state pay grants directly to
sectarian schools, in this case St. Dominic's, to subsidize their
children's schooling.  Given the present state of jurisprudence, we
can see no way in which this can be done without violating the
Establishment Clause.  See Nyquist, 413 U.S. at 780.  As a result,
we find no Equal Protection Clause violation.
        We are fortified in our conclusion by the Maine Supreme
Court's recent opinion in Bagley v. Raymond School Department, --
A.2d --, No. 98-281, 1999 WL 236464 (Me. April 23, 1999),  dealing
with a similar situation.  In resolving a similar Equal Protection
Clause challenge, the court stated:
                   That state funds would flow directly into
        the coffers of religious schools in Maine were
        it not for the existing exclusion cannot be
        debated.  If the religious school exclusion
        were eliminated, the State would likely pay
        more than $5,000 per student to Cheverus High
        School, without restriction on the use of
        those funds.  In the entire history of the
        Supreme Court's struggle to interpret the
        Establishment Clause it has never concluded
        that such a direct, unrestricted financial
        subsidy to a religious school could escape the
        strictures of the Establishment Clause.  While
        it may be possible for the legislature to
        craft a program that would allow parents
        greater flexibility in choosing private
        schools for their children, the current
        program could not be easily tailored to
        include religious schools without addressing
        significant problems of entanglement or the
        advancement of religion.

Bagley, slip. op. at 40-41.
III.  Free Exercise
        Plaintiff-appellants argue that  2951(2) violates the
Free Exercise Clause of the First Amendment because it excludes
funding of sectarian education solely on the basis of religion.  
However, we conclude that the Free Exercise Clause is not
implicated here.  See Sherbert v. Verner, 374 U.S. 398, 412 (1963)
(Douglas, J., concurring) ("[T]he Free Exercise Clause is written
in terms of what the government cannot do to the individual, not in
terms of what the individual can exact from the government.").
        Four points support our conclusion.  First, at least some
of the parents in this litigation eschew any religious motivation
for wishing to attend St. Dominic's.  For them, academic
superiority, rather than the school's Roman Catholic affiliation,
drives their enrollment decisions.
        Second, no one plausibly reading the statute could come
to any conclusion other than that  2591(2) does not prevent
attendance at a religious school.  Nor does  2591(2) prevent
religious education of children in Maine.  All it means is that the
cost of religious education must be borne by the parents and not
the state.
        Third, Hernndez v. Commissioner, 490 U.S. 680, 699
(1988), identifies the free exercise inquiry as asking "whether
government has placed a substantial burden on the observation of a
central belief or practice." (emphasis added).  Factually speaking,
education at a parochial school is not such a belief, for the Roman
Catholic Church does not mandate it.  See Catechism of the Catholic
Church 537-38 (1994) (stating that parents' responsibilities for
religious education for religious education takes place primarily
in the home and that choosing a religious school is a right but not
an absolute duty).  To be sure, the Catholic Church requires some
religious education, see id. at 538, but as stated above,  2591(2)
does not prevent such religious education.  Indeed, it says nothing
about it.  Moreover, no parent makes the claim that attendance at
a religious school is a central tenet or practice of their faith.
        Fourth, the primary case cited by the parents, Church of
the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520
(1993), is inapposite.  In that case, the record showed a
substantial animus against Santera that motivated the law in
question.  See id. at 543 (stating that the "record in this case
compels the conclusion that suppression of the central element of
the Santeria worship service was the object of the ordinances.").  
No such showing has been made here.
        As we mentioned earlier, even if this were a limit on
free exercise, the state has justified the limit by its purpose of
avoiding violation of the Establishment Clause.
IV.  Due Process and Speech Clause Claims
        Plaintiff-appellants argue that  2951(2) violates the
Due Process Clause of the Fourteenth Amendment and the Speech
Clause of the First Amendment by preventing appellants from using
their tuition allotments to expose their children to the
educational message which best reflects their morals and values.   
        First, the parents argue that they have a fundamental
right to direct the upbringing and education of their children
based on substantive due process rights that arise from Supreme
Court decisions.  See, e.g., Pierce v. Society of Sisters, 268 U.S.
510 (1925).  On that general proposition, we do not disagree.  
However, that fundamental right does not require the state to
directly pay for a sectarian education. Here, the statute does not
prevent the parents from doing what they wish; it only prevents the
state from helping pay for their wishes.  We reject this contention
out of hand.   
        Second, on the free speech side, plaintiff-appellants
contend that  2591(2) violates plaintiff-appellant's their rights
because it denies parents the right to communicate and instruct
their children in the areas of religion, morals and ethics which
they cannot accomplish in non-sectarian schools.  With little more
than academic articles to bolster their view, we find this claim to
be meritless as well.
                           CONCLUSION
        The judgment of the district court is affirmed.  Costs
are imposed against appellants.

                                  "Concurrence to follow"

        CAMPBELL, Senior Circuit Judge, concurring.  I agree that
plaintiffs have not shown that Maine's statute subsidizing
attendance at non-sectarian private schools, in communities lacking
public schools, is unconstitutional.  But I see no need for this
court to decide that a broader statute (i.e., one also subsidizing
attendance at sectarian private schools) would violate the
establishment clause of the First Amendment ("Congress shall make
no law respecting an establishment of religion").
        For the reasons stated by my colleagues, supra, I agree
that the Maine statute, as presently written, does not violate the
free exercise clause of the First Amendment nor principles of
substantive due process.
        My colleagues and I part company, however, in our
analysis of plaintiffs' establishment clause and equal protection
clause claims.  The Maine tuition statute was narrowed in 1981 to
exclude religiously-affiliated schools in response to a decision of
the Maine Attorney General concluding that the inclusion of
religiously-affiliated schools in Maine's tuition program violated
the establishment clause of the federal Constitution.  See Bagley,
et al. v. Raymond School Department, -- A.2d --, 1999 WL 236464
(Me. April 23, 1999).  Last month, the Maine Supreme Judicial Court
upheld the continued constitutionality of the exclusion of
sectarian schools, holding that to fund them would violate the
establishment clause.  My colleagues apparently believe, as did the
Maine court, that since the Maine legislature excluded sectarian
schools because of establishment clause concerns, the latter must
be addressed by us: the Maine court, indeed, suggested that if
allowing tuition benefits to the sectarian schools would not
violate the establishment clause, then denying such benefits would
violate the equal protection clause, as denial would not then
withstand even the minimal, "rational basis," scrutiny under the
Constitution's equal protection clause.  In such event, plaintiffs
would have succeeded in demonstrating that the current statute is
unconstitutional, being violative of the equal protection clause.
        While I understand the above rationale, I think it goes
further than necessary.  I prefer not to render an opinion based on
speculation as to the constitutionality of a statute different from
the one under discussion.  Contrary to what my colleagues seem to
suggest, supra, ours is not a case that involves the "imbroglio" of
direct subsidies paid to sectarian schools.  Rather, the Maine
legislature, acting on the basis of an opinion issued by its
Attorney General, has expressly excluded sectarian schools from the
possibility of receiving subsidies.  The question is whether the
current statute is unconstitutional, not whether a more inclusive
one would be.
        Plaintiffs argue that various constitutional provisions,
including, oddly, the establishment clause itself, are offended by
denying tuition benefits to sectarian schools.  But none of
plaintiffs' theories of unconstitutionality work.  The  
establishment clause certainly provides plaintiffs with no
affirmative basis for requiring the funding of sectarian schools,
for reasons well explained by the Maine Supreme Judicial Court in
its recent  decision, -- A2d at -- , 1999 WL 236464 at 5, and by my
colleagues.
        Because plaintiffs' attempt to use the establishment
clause as a sword fails, and because the Maine statute does not,
for the reasons stated by my colleagues, violate the free exercise
clause, no fundamental right is implicated here for equal
protection purposes.  Thus, the proper level of scrutiny under the
equal protection clause is the most deferential - rational basis
review.  See Johnson v. Robison, 415 U.S. 361, 375 n.14 (1974)
(where Act did not violate appellee's right of free exercise of
religion, court has no occasion to apply a standard of scrutiny
stricter than rational basis test); see also Griffin High School v.
Illinois High School Ass'n, 822 F.2d 671, 674 (7th Cir. 1987).
        In my view, plaintiffs' equal protection clause claim
fails not because, as my colleagues conclude, the Maine Attorney
General's opinion relied upon by the legislature was necessarily
correct that including sectarian schools would or might violate the
establishment clause, hence was better left alone.  Rather, the
action of the Maine legislature need only be supported by a
rational basis, not one that turns out to be correct on the merits.  
Rational basis review is "a paradigm of judicial restraint" . . .
and "[w]here there are 'plausible reasons' for [the action of the
legislature], 'our inquiry is at an end.'"  FCC v. Beach
Communications, Inc., 508 U.S. 307, 314 (1993)(quoting United
States R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 179 (1980)).  
See also Western & Southern Life Ins. Co. v. State Bd. of
Equalization, 451 U.S. 648, 672 (1981) ("the Equal Protection
Clause is satisfied if we conclude that the California Legislature
rationally could have believed" that the measure promoted its
objectives) (emphasis in original).
        The Maine legislature rationally could have believed that
including sectarian schools within its funding scheme would or
might violate the establishment clause, hence was better left
alone.  Several opinions of the United States Supreme Court cited
by my colleagues and by the Maine Supreme Judicial Court
undoubtedly lend support to such a viewpoint.  See, e.g., Committee
for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756 (1973).  
These precedents are not conclusive, however, and many commentators
interpret the more recent cases as indicating  that the Supreme
Court will uphold state tuition schemes that provide funding to
sectarian as well as non-sectarian schools.  The fact is that
establishment clause jurisprudence as applied to this particular
area is so unclear today that no court other than the Supreme Court
can reliably resolve whether a statutory scheme like Maine's would
violate the establishment clause were it to fund sectarian as well
as non-sectarian schools.  In spite of this uncertainty, however,
the Maine legislature's fear, based on its Attorney General's
analysis, that including sectarian schools would violate the
establishment clause was and remains entirely rational.  While the
odds were perhaps stronger in 1981 than they are today, existing
case law still provides a reasonable basis for legislative refusal
to extend tuition grants to sectarian schools.  I see the Maine
legislature, in 1981 and to this moment, as having rationally and
prudently excluded sectarian schools because of a well-founded
concern - whether or not ultimately correct - that to do otherwise
will or may violate the establishment clause.  The existence of
that fear is rational enough, I think, to meet equal protection
(and free exercise) requirements, however defined.
        This is not to say that the Supreme Court may not  
someday decide that inclusion of sectarian schools in a scheme like
this is permissible under the establishment clause.  A strong
argument can be made to that effect.  Were the Supreme Court to so
rule, plaintiffs might then be in a position to seek relief on free
exercise or equal protection grounds, for under those circumstances
the legislative basis for the exclusion of sectarian schools - the
fear that the establishment clause bars their inclusion - will have
been negated.  But in today's climate, lacking further Supreme
Court enlightenment, plaintiffs cannot demonstrate that the Maine
statute violates any provision of the Constitution.  Accordingly,
I agree that we should affirm the judgment of the district court,
but - like that court - I see no need whatever to reach out and
decide the thorny establishment clause issue -- an issue that, as
my colleagues also recognize, can be meaningfully resolved only by
the Supreme Court itself.

</body>

</html>